*Malik Small v. State*, Case No. 916, September Term 2016
Opinion by Leahy, J.

**HEADNOTES:**
***Malik Small v. State of Maryland*, No. 916, September Term 2016**
**Opinion by Leahy, J.**

1. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – BURDEN OF PROOF**

   Once an accused is successful in "showing that the procedure employed to obtain the identification was unduly suggestive[,] . . . the State must then prove, by clear and convincing evidence, that the independent reliability in the identification outweighs the 'corrupting effect of the suggestive procedure.'" *Gatewood v. State*, 158 Md. App. 458, 475 (2004) (quoting *Thomas v. State*, 139 Md. App. 188, 208 (2001), *aff'd*, 369 Md. 202 (2002)). The reliability analysis is not intended as a means to discover another ground for excluding the identification, but rather, an opportunity for the State to limit exclusion. *Conyers v. State*, 115 Md. App. 114, 120 (1997). Should the State fail to meet its burden, then any subsequent in-court identification by the person who made the unreliable pretrial identification is inadmissible, unless the State can show an independent source for the identification. *Id.* at 121.

2. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – SUGGESTIVENESS**

   Suggestiveness in the context of a photo array arises "when the manner itself of presenting the array to the witness or the makeup of the array indicates which photograph the witness should identify." *Smiley v. State*, 442 Md. 168, 180 (2015) (citations omitted). The identification procedure must not only be suggestive, but *impermissibly* suggestive.

3. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – SUGGESTIVENESS**

   When evaluating the procedure employed by law enforcement to obtain a photo identification, trial courts should examine the level of uniformity of physical features between the persons in the photo array.

4. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – SUGGESTIVENESS**

   The inclusion of Appellant's photo in the first photo array showing the tattoo on his neck—where no other person had a visible neck tattoo—coupled with the fact that Appellant was the only person whose photo was repeated in the second array, rendered the identification procedure impermissibly suggestive.

5. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – INCLUSION OF UNIQUE FEATURES**

Filler photos should include photos of persons who resemble the description of the suspect, including any unique or unusual features.

6. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – INCLUSION OF UNIQUE FEATURES**

The inclusion of a unique identifying mark described in detail by a witness may aid in ensuring that an identification is trustworthy.

7. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – MULTIPLE ARRAYS**

As the Supreme Court instructed in *Foster v. California*, 394 U.S. 440 (1969) and this Court restated in *Morales v. State*, 219 Md. App. 1 (2014), the inclusion of an individual—over the course of multiple photo arrays where no other persons are repeated—has the propensity to be suggestive and irreparably taint the identification if the repetition signals to the witness who he or she should select.

8. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – MULTIPLE ARRAYS**

Inclusion of the defendant's photo in a second array after the witness fails to identify the defendant in the first array could be impermissibly suggestive if the record demonstrated that there was some reason for the witness to notice it. *Morales v. State*, 219 Md. App. 1, 18 (2014).

9. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – RELIABILITY OF THE IDENTIFICATION**

The reliability inquiry is designed to be a limitation on exclusion and is intended to cut against a presumption of inadmissibility for impermissibly suggestive pretrial identifications. *Conyers v. State*, 115 Md. App. 114, 120 (1997).

10. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – RELIABILITY FACTORS**

The *Biggers* factors are not intended to be exclusive because the reliability of an identification should be determined by the totality of the circumstances and by weighing the facts of each case. *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

11. **CRIMINAL LAW – PHOTOGRAPHIC ARRAYS – RELIABILITY – PRIOR**

## FAMILIARITY WITH THE ASSAILANT

The degree of prior familiarity between the victim and the assailant is but one factor in the totality of circumstances equation.  Although a lesser showing of prior familiarity may require stronger independent indicia of reliability, we will not deem irrelevant a victim's prior contact with his or her assailant simply because they met only a few times before.

Circuit Court for Baltimore City
Case No.115191006

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 916

September Term, 2016

_____

MALIK SMALL

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Leahy,
Harrell, Glenn T., Jr.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  March 1, 2018

The victim, Mr. Ellis Lee, was waiting at a bus stop in Baltimore City at approximately 2:00 a.m. on June 17, 2015.  A man, who was covering part of his face with his T-shirt, pointed a gun at Mr. Lee and told him to hand over his money.  Once it became clear that Mr. Lee did not have any money, the man told Mr. Lee to run and then opened fire, striking Mr. Lee once in his right lower calf muscle as he was fleeing.

Shortly thereafter at the hospital, Mr. Lee gave a description of his assailant, noting that the man had a neck tattoo with a block-cursive "M" in it, and that he believed that he had seen him before and recognized his voice.  Later that same morning, after Mr. Lee was released from the hospital, he was transported to the police station where he viewed two photo arrays.  In the first photo array, Malik Small ("Appellant") was the only person featured with a neck tattoo.  Mr. Lee indicated that Appellant's photo may depict the man who shot him, but said that he was not sure.  Then the officers presented Mr. Lee with a second photo array, and, although this time all photos featured persons with neck tattoos of various content, Appellant's photo was only one of two that had lettering in the tattoo.  More significantly, Appellant's photo was the only one repeated from the first photo array and the only one with a block cursive "M."  Mr. Lee selected Appellant, stating, "This is the same tattoo and face I remember robbing me and the man I remember shooting me.  I also remember him from coming into my job on two different occasions."

Prior to his jury trial in the Circuit Court for Baltimore City, Appellant moved to suppress anything arising from both of the photo arrays prepared by the Baltimore City Police Department for Mr. Lee.  The suppression court, although troubled by the

suggestiveness of repeating Appellant's photo in the second photo array, found by clear and convincing evidence that Mr. Lee's identification was reliable.

Appellant's first challenge—and the primary focus of this appeal—is whether the suppression court erred in denying his motion to suppress. We hold that the inclusion of Appellant's photo in the first photo array showing the distinctive "M" tattooed in cursive on his neck—where no other person had a visible neck tattoo—coupled with the fact that Appellant was the only person whose photo was repeated in the second array, rendered the identification procedure impermissibly suggestive. We conclude, however, that the totality of the circumstances surrounding Mr. Lee's identification of Appellant—including recalling the unique features of his tattoo—made it sufficiently reliable to overcome the suggestive nature of the identification procedure and forfend violation of Appellant's rights under the Due Process Clause.

At the conclusion of his trial, the jury convicted Appellant of attempted robbery, second degree assault, and reckless endangerment.

Appellant assigns error on several additional rulings by the trial court as reflected in the following issues, which we quote from Appellant's brief:

> "Did the trial court err in allowing the State to impermissibly argue its opinion regarding the credibility of the Defense's sole alibi witness?"

> "Did the trial court abuse its discretion when it sustained the State's objection to entry of Appellant's relevant phone records into evidence?"

> "Did the trial court err by refusing to grant Appellant's motion for judgement of acquittal on the grounds that the State failed to present evidence sufficient to sustain Appellant's convictions for attempted robbery, second degree assault, and reckless endangerment?"

Discerning no error or abuse of discretion, we affirm the trial court's judgments.

## BACKGROUND

### A. The Hearing on the Motion to Suppress

On March 18, 2016, Appellant moved to suppress the fruit of the two photo arrays prepared and administered by the Baltimore City Police. At the outset, the court suppressed the State's use of the first photo array because Det. Stanley Ottey, the detective who administered the first photo array, was unavailable at the time of the hearing. The hearing continued then on the question of whether the second photo array should be suppressed.

Mr. Lee testified to the course of events on June 17, 2015. He stated that at about 2:00 a.m. in the morning

> [I w]as sitting on the bus stop, the 36 bus stop on Northern Parkway and Alameda, had my phone in my right hand, checking my phone, and in the corner of my ear, I hear "Let me get your money." I looked to my immediate right. There's a male looking at me with a gun aimed towards me. I told him I don't have anything. . . . There was no wallet on me. He said, "Run, bitch." So he has a gun, so I ran.

He then "heard some shots go off and [he] felt the pluck at the back of [his] leg and [] kept running." He stopped briefly to call his family, and eventually he made his way to Gittings Avenue, where he sought help at the fire department located there. Mr. Lee was transported by ambulance to The Johns Hopkins Hospital emergency room. Baltimore City police officer Kenneth Howard, who was later joined by detectives Joel Hawk and Matthew DiSimone, met with Mr. Lee at the hospital and interviewed him about what happened.

Det. DiSimone testified that Mr. Lee described his attacker as

3

[a] black male, light skin, believed he had seen him before, a light [T]-shirt, tattoo on the right side of his neck, 5'8", regular sized, a short haircut. He held the bottom of his shirt up over his face, blue jeans, block letter tattoo on neck, had a letter M in it.

Mr. Lee told the detectives that he believed he had seen his assailant at his job at Staples on approximately two prior occasions, but could not specify the time frame. According to Det. DiSimone, Mr. Lee recognized his assailant because of "the tattoo and his voice."

Some hours later, after Mr. Lee's gunshot wound was treated and he was released from the hospital, the detectives drove Mr. Lee to the bus stop on Northern Parkway so that he could show them exactly where the incident occurred. Afterward they drove Mr. Lee to the police station where they continued interviewing him about the crime.

**1. The First Photo Array**

Det. DiSimone was permitted to testify as to how he compiled the first photo array in order to give context for his testimony concerning how he generated the second photo array. He recounted that when they returned to the station on the morning of the 17th, Mr. Lee provided another description of the assailant and his tattoo. Consulting his notes from that morning, Det. DiSimone said Mr. Lee described the assailant as "[a] light brown, black male, 5'8", regular sized, with a scraggly beard, [and] a tattoo on his neck." And Mr. Lee described the tattoo as "[b]lock styled cursive script, bold, not dull, containing multiple letters and at least one of them was an M[.]"

Det. DiSimone then used a Baltimore City Police Department database to compile a group of mugshots to create a photo array based on the description Mr. Lee provided. He

4

searched for males between 5'6" and 5'8" with light brown complexions and beards, but he did not include neck tattoos in the search.

Det. DiSimone confirmed that the first photo array was administered at roughly 8:30 a.m., and featured six African-American males, appearing to be around the same age, directly facing the camera. Each man had a beard and short, cropped hair. Despite Det. DiSimone's intention to leave tattoos out of the photos,[1] Appellant's photo was the only photo in the array with a tattoo visible on the side of his neck. The tattoo, shown from the front, displayed a cursive "M".

Mr. Lee testified that the detectives brought him "a collection of pictures on the first sheet." He recalled that, "I picked out one who kind of looked like him, but I wasn't too sure. I was, like, okay, I see the tattoo. I remember there being a LYM tattoo." The court asked:

> THE COURT: You mean you saw the tattoo on the picture or you saw the tattoo –
>
> MR. LEE: Yeah.
>
> THE COURT: – on the person?

---

[1] During the suppression hearing, Det. DiSimone testified to the following:

> [DET. DISIMONE]: After I received the information, number 2 contained who I believed was our suspect, but because the first photo array only had frontal pictures because we were trying to keep the tattoo out of the view, I believed that if a second array was shown containing side profile pictures, which gave a view of the tattoo, it might assist in [identification].

Det. DiSimone further testified that his intention was "to not have the tattoos show" because he "felt that the tattoo was described in so much detail that it would be leading if I put the tattoo in the picture."

MR. LEE: The tattoo on the neck, I just related the two. I was like, oh, it looks pretty much like the same tat I saw. I identified the person, but I told them, I was like, "He was covering his face with the shirt." I'm not going to give you 100 percent of somebody's life in my control. He said, "Okay. I understand." I gave him in terms of 80 percent sure.

Det. Ottey, who administered the photo array, noted Mr. Lee's statement on the Photograph Array Action form: "# 2 looks like him, doesn't think it's him." Det. DiSimone testified that the first photo array was a "negative array," meaning that a positive identification had not been made.

## 2. The Second Photo Array

After the conclusion of the first photo array, Mr. Lee gave another taped statement at 11:16 a.m. Det. DiSimone testified that he conducted the interview, and that he relied on Mr. Lee's description of the tattoo in creating the second photo array. Using the same database, he inserted the parameters: "[b]lack male, light brown skin, and [] tattoo on neck." When asked whether the search parameters included tattoos with letters, Det. DiSimone testified that some of the tattoos may have had letters, while others did not. When pressed by the court on this point, Det. DiSimone testified that he did not include tattoos with letters as part of his search parameters. He explained that this was because the number of people who had tattoos and met other parameters, such as light brown skin, was very small. From the limited number of "hits" that matched those parameters, Det. DiSimone selected five male suspect profiles to include with Appellant's, making six persons featured in the second array.

The second photo array, introduced at the suppression hearing as Defendant's Exhibit 4, contained two photographs on one page for each person; the photo on the left showed the person facing the camera and the photo on the right showed the person looking to his left, displaying the right side of his face and neck in profile. Appellant was the only individual that appeared in both the first and second photo arrays. Each person shown in the second array had some sort of tattoo on the right side of his neck, and one other person besides Appellant had a tattoo featuring cursive letters. Appellant's suspect profile, however, was the only one to contain a cursive script tattoo[2] with a block letter "M"[3] and

---

[2] In Defendant's Exhibit 4 contained in the record on appeal, the third photo, which features Appellant facing towards the right side of the page, the cursive script letters "LYM" are prominently featured on his neck. The "Y" is positioned in line with the middle of his ear, and is surrounded, respectively, by a cursive "L" and "M". The person featured in the fourth photo is the only other person in the photo array with lettering in the tattoo on his neck. The tattoo featured in that photo shows cursive lettering (not block) spelling "Kalla."

[3] While Appellant does not expressly make the argument in his brief that he was the only person featured in either photo array with a cursive "M" on his neck, his counsel made the argument during the suppression hearing. Near the end of the suppression hearing, during Appellant's counsel's closing argument, the following colloquy occurred:

[APPELLANT'S COUNSEL]: When you look at that photo array, that second photo array, when they were supposed to be – compil[ing] a photo array that contained [ ]tattoos with an M, none of those individuals in those photographs contain a tattoo with an M at all, and in fact, the only person with the M is [Appellant]. . . .

* * *

So I would argue, Judge, that certainly the photo array as it was compiled, and particularly the second one where they had this information – if you believe they had this information about the tattoo and the M and all the other information and certainly Detective DiSimone testified that he relied on that information and (inaudible) description of the tattoo and the M when he put

7

his skin tone appears markedly lighter than that of the other men featured in the second photo array.

The court asked Det. DiSimone:

[THE COURT]:  Were any of the photographs used in the first photographic array used again in the second photographic array?

[DET. DISIMONE]:  No, ma'am, just the suspect.

[THE COURT]:  And why not?

[DET. DISIMONE]:  Because they didn't have tattoos on their neck.

Once Det. DiSimone finished compiling the array, Sergeant Det. Ethan Newberg, who was not involved with the investigation, administered the second photo array, roughly three hours after the first, at approximately 11:45 a.m.  When Mr. Lee saw the third photo in the second array, which showed a frontal and side picture of Appellant, Mr. Lee said,

---

together the photo array, whether he felt that, hey, I'm just going to put tattoos in the parameter.  I'm not even going to try to put five people with M's or N or S or any letters at all for that sake, I'm just going to put – and bold –

THE COURT:  Well, there's some that have letters.  There's some tattoos in the photo array that have letters.

[APPELLANT'S COUNSEL]:  One.

THE COURT:  Two.

[APPELLANT'S COUNSEL]:  Not an M.

THE COURT:  Not an M.  I'll concede –

[APPELLANT'S COUNSEL]:  Not an M.

8

"That's him. That's who shot me." Sgt. Newberg recorded this statement electronically in his notes. Mr. Lee also wrote beneath the photo: "This is the same tattoo and face I remember robbing me and the man I remember shooting me. I also remember him from coming into my job on two different occasions."

At the suppression hearing, Mr. Lee testified that at the time he made the second identification he was "100 percent [sure] that that was the person[]" who had shot him. Mr. Lee testified that he had previously encountered the individual he selected from the photo array because the individual had come into the Staples, where Mr. Lee worked, about two times, and he recognized the voice of the man who shot him to be the same as the person whom he encountered on his job.

Approximately two weeks after making this identification, Mr. Lee called Det. DiSimone to report seeing a man that he believed was the assailant from the night of the shooting. Mr. Lee testified:

> MR. LEE: I saw a gentleman on a dirt bike, looks very similar to him right here. So I called [Det. DiSimone]. I said, "Could this be the guy here," because when he looked at me –
>
> THE COURT: So the record should reflect that the witness gestured towards [Appellant]. Go ahead.
>
> MR. LEE: When we – when I had seen him, when I looked at him, his eyes got huge and he sped off through a red light. So I just called [Det. DiSimone] to be sure. I said, "Hey, you know, just to be sure, I remember you saying the guy was arrested already." He said, "Well, that can't be true. We already have the guy and he's" –
>
> THE COURT: Turn to me now. I can't hear you.

9

MR. LEE: I'm sorry. He said, "that can't be true. We already have the guy. You know, he's already confessed to it.[4] You're fine. You should be fine. Is everything okay?" And I told him what happened.

Additionally, Mr. Lee testified that "way after"[5] identifying Appellant in the second photo array as the man who attacked him, he indicated that he was only 70 percent sure that he was correct. The court asked him, "[s]o what changed between the day of the incident when you're 100 percent sure and way after when you're 70 percent sure?" to which Mr. Lee responded, "I don't even know."

During closing arguments, defense counsel urged the court to find that the identification process was unduly suggestive because "they had already shown [Mr. Lee] a picture of [Appellant]" and because after the first negative photo array, the detectives showed Mr. Lee a second array in which "[t]he one constant was [Appellant], the same individual that Mr. Lee had said [he] wasn't sure and didn't think that was him[.]" Counsel pressed:

> When you look at that photo array, the second photo array, when they were supposed to be – compile [sic] a photo array that contained M, tattoos with an M, none of those individuals in those photographs contain a tattoo with an M at all, and in fact, the only person with the M is [Appellant]. So when Mr. Lee looks at this, the only person – if he said, "I told you all that the person had [was] an M, show me photographs of people with M's so I can attempt to identify," and they show him six photographs and of the six

---

[4] At trial, Det. DeSimone, on cross-examination, admitted that Appellant had actually denied committing the crime and did not confess.

[5] At trial, Mr. Lee explained further that on March 10, 2016—eight days before the suppression hearing—he met with an investigator from the State's Attorney's Office regarding the case. During that meeting, Mr. Lee told the investigator that he had "some doubts" as to the person he identified in the second photo array and was only "70 percent" sure that it was the right person.

photographs, only one of those photographs contain a person with an M, and if that isn't unduly suggestive that the only person that I'm looking for an the only distinguishing characteristic of the person that I'm trying to identify because I've told them about this M is [Appellant], then obviously that would be the person that he would pick out.

Ultimately, the suppression court denied Appellant's motion to suppress the second

photo array, stating:

All right. Well, as I said, I have no problem with the tattoo. I mean, you can't – I don't think it's reasonable to expect the police to find tattoos that are similar in addition to Defendant's that are similar. So I have no problem with the fact that everybody in the [second] photo array doesn't have the identical tattoo or even letters in their tattoo.

My problem is with the timing, with the fact that they showed a picture of the Defendant at 8:30 in the morning. In one photo array, he says, "I'm not sure that's the guy," and then they show him another photo array three hours later, approximately three hours later, and the only person that's repeated in the second photo array is the Defendant. That's troubling.

Otherwise, I think the [second] photographic array, Defense 4, on its face is not suggestive. The procedure used during that small time that this photograph was shown to Mr. Lee does not appear suggestive.

So the question becomes for this Court by the preponderance of the evidence do I believe that the [second] photographic array was suggestive. The problem is that I find that it's reliable by clear and convincing evidence because the Defendant – the victim – the alleged victim knew who the Defendant was. He had already seen him twice before. He recognized the voice. It had nothing to do with the photograph.

So for those reasons, I'm going to deny the Defense's motion and allow the [second] photographic array be entered into evidence.

### B. The Trial

At trial, Mr. Lee recounted the events that transpired on the night of the shooting.

He testified that he described the assailant's physical appearance, including his neck tattoo,

when he was at the hospital. Additionally, Mr. Lee noted that while he did not know his attacker personally, he believed that he had seen him and heard him speak "around two times" at his job within the three months prior to the incident. Mr. Lee then identified Appellant in court as the "person that attempted to rob" him.

Mr. Lee was asked if he remembered being shown a set of photographs, and was asked to relay the instructions that he was given before viewing the first photo array. The State asked Mr. Lee to recount how he selected a picture that he recognized in the first array, and he answered "[t]he tattoo. The skin color helped." When asked specifically about why the tattoo stood out to him, he answered that "[i]t was the M that stood out the most, almost as if I was there at that very moment looking at him."

Mr. Lee was then shown the second photo array, labeled as State's Exhibit #2A, and he indicated that he identified "Number 3" as his assailant. The State then offered into evidence the second photo array and the instructions given prior to the second array. The trial court admitted both documents over the defense's objection.

Testimony established that early in the morning on June 17, Detectives DiSimone and Hawk returned to the scene of the crime to canvass the area, but were unable to find any blood trails, shell casings, or "any other signs . . . that that was the crime scene[.]" Det. DiSimone admitted on cross-examination that he did not go to the Staples store where Mr. Lee claimed that he had seen Appellant "to do any investigation" or "pull any video . . . to try to determine if [Appellant] had ever been" to that store. He also admitted that after receiving a phone call from Mr. Lee detailing his belief that he may have encountered the

12

man who robbed him, riding on a dirt bike, he did not "do any further investigation as to the information that [Mr. Lee] provided[.]" Apart from Mr. Lee's identification, the State introduced no other evidence that linked Appellant to the crime. At the close of the State's case, Appellant moved for an acquittal on all charges. The trial court denied the motion.

Ms. Tiana Thomas, Appellant's girlfriend and sole defense witness, then testified as an alibi witness. Ms. Thomas testified that she called Appellant on the night in question after her work shift and that the two went to bed together before midnight. She said that Appellant did not leave the house during the night, that he left the house the next morning after 8:00 a.m., and that she called his phone to inform him that he forgot something at the house. Appellant attempted to enter phone records showing Ms. Thomas's phone calls to Appellant on June 16 and June 17. The State objected to the entrance of records "that she's already testified to." The trial court sustained the objection.

Appellant then renewed his motion for judgment of acquittal on all charges. He argued that there was testimony that could lead a reasonable jury to doubt Mr. Lee's credibility because "he says he's only 70 percent" sure that his identification was correct. The trial court denied the motion, stating that "[i]f the jury believes Mr. Lee, then I'm satisfied that a reasonable jury could find [Appellant] guilty[.]"

The jury found Appellant guilty of attempted robbery, second-degree assault, and reckless endangerment.[6] The trial court sentenced Appellant to eight years of

_____

[6] The jury acquitted Appellant on all charges that involved the use of a firearm, which included attempted robbery with a dangerous weapon; first-degree assault; use of a

13

incarceration. Appellant noted this timely appeal.

We include additional facts as they pertain to the issues in the following discussion.

## DISCUSSION

## I.

## The Motion to Suppress the Second Photo Array

Our review of the circuit court's denial of the motion to suppress is limited "'to the record of the suppression hearing[.]'" *James v. State*, 191 Md. App. 233, 251 (2010) (citations omitted). We will not disturb the suppression court's findings of fact and credibility determinations unless they are clearly erroneous, and we review the evidence and the inferences that may be reasonably drawn therefrom in the light most favorable to the prevailing party. *McFarlin v. State*, 409 Md. 391, 403 (2009) (citation omitted). However, we consider whether a constitutional right has been violated independently, under a *de novo* standard of review, applying the law to the facts. *State v. Andrews*, 227 Md. App. 350, 371 (2016) (citing *Williams v. State,* 372 Md. 386, 401 (2002) (additional citation omitted).

Appellant contends that the suppression court's failure to grant his motion to suppress violated his right to due process. In support of this contention, Appellant cites *Webster v. State*, 299 Md. 581 (1984), for the proposition, "'[D]ue process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial

firearm in a crime of violence; wearing, carrying, or transporting a handgun on his person; and discharging a firearm.

identifications obtained through unnecessarily suggestive procedures.'" *Id.* at 599-600

(quoting *Moore v. Illinois*, 434 U.S. 220, 227 (1977) (other citations omitted).

The Due Process Clause is implicated "when law enforcement officers use an

identification procedure that is both suggestive and unnecessary."[7] *Perry v. New*

*Hampshire*, 565 U.S. 228, 238-39 (2012) (synthesizing *Manson v. Brathwaite*, 432 U.S.

98, 107, 109 (1977) and *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). A photographic

identification procedure that is "so impermissibly suggestive as to give rise to a very

---

[7] Justice Ginsburg, writing for the majority in *Perry*, clarified in a footnote that "what triggers due process concerns is police use of an unnecessarily suggestive identification procedure, whether or not they intended the arranged procedure to be suggestive." 565 U.S. at 232 n.1. In *Perry*, the petitioner challenged an identification made by a person who witnessed someone breaking into cars from her window and called the police. *Id*. at 233-34. When officers arrived at the scene, one officer went to the witness's apartment to interview her about what she saw. *Id.* at 234. She was asked for a specific description, and spontaneously pointed from her kitchen window to a man standing in the parking lot next to the other police officers and identified him as the perpetrator of the crime. *Id.* The Supreme Court "granted certiorari to resolve a division of opinion on the question whether the Due Process Clause requires a trial judge to conduct a preliminary assessment of the reliability of an eyewitness identification made under suggestive circumstances not arranged by the police." *Id*. at 236 (footnote omitted). The Court decided, "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id.* at 245.

Despite the majority's assertion that it is not the intention of the police that is relevant, but rather, whether the circumstances under consideration were "police-arranged," *id.* at 232, Justice Sotomayor declared in her dissenting opinion that the majority "graft[ed] a *mens rea* requirement onto our existing rule." *Id.* at 255. She concluded that the "arrangement-focused inquiry will sow needless confusion." *Id.* at 256. Justice Sotomayor insisted that "[o]ur due process concerns were not predicated on the source of suggestiveness. Rather, '[i]t is the likelihood of misidentification which violates a defendant's right to due process,' and we are concerned with suggestion insofar as it has 'corrupting effect[s]' on the identification's reliability." *Id.* at 257 (internal citations omitted) (alterations in *Perry*).

substantial likelihood of irreparable misidentification[,]" should be suppressed. *Simmons v. United States*, 390 U.S. 377, 384 (1968).

In *Simmons*, Justice Harlan, writing for the majority, forcefully described how photographic arrays, if conducted improperly, may give way to incorrect identifications:

> A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, *or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. . . . Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen*, reducing the trustworthiness of subsequent lineup or courtroom identification.

390 U.S. at 383-84 (emphasis added) (footnote omitted).

In determining whether to suppress an extra-judicial identification on due process grounds, Maryland suppression courts undertake a two-step inquiry:

> The first is whether the identification procedure was impermissibly suggestive. If the answer is "no," the inquiry ends and both the extra-judicial identification and the in-court identification are admissible at trial. If, on the other hand, the procedure was impermissibly suggestive, the second step is triggered, and the court must determine whether, under the totality of the circumstances, the identification was reliable . . . [U]nless and until the defendant establishes that the identification procedure was in some way suggestive, the reliability of a witness' identification is not relevant for due process purposes.

*(Kevin) Jones v. State*, 395 Md. 97, 109-10 (2006) (internal citations and footnote omitted).

Thus, in order to suppress a pretrial identification, the accused person bears the burden "to

16

make a prima facie showing of suggestivity at a suppression hearing." *Id.* at 115. In other words, the accused "must show 'some unnecessary suggestiveness in the procedures employed by police.'" *Thomas v. State*, 213 Md. App. 388, 417 (2013) (citation omitted). An identification procedure that falls "[s]hort of that point[] . . . 'is for the jury to weigh.'" *Turner v. State* 184 Md. App. 175, 185 (2009) (quoting *Brathwaite*, 432 U.S. at 116).

Once an accused is successful in "showing that the procedure employed to obtain the identification was unduly suggestive[,] . . . the State must then prove, by clear and convincing evidence, that the independent reliability in the identification outweighs the 'corrupting effect of the suggestive procedure.'" *Gatewood v. State*, 158 Md. App. 458, 475 (2004) (quoting *Thomas v. State*, 139 Md. App. 188, 208 (2001), *aff'd*, 369 Md. 202 (2002)). The reliability analysis is not intended as a means to discover another ground for excluding the identification, but rather, an opportunity for the State to limit exclusion. *Conyers v. State*, 115 Md. App. 114, 120 (1997). Should the State fail to meet its burden, then any subsequent in-court identification by the person who made the unreliable pretrial identification is inadmissible, unless the State can show an independent source for the identification. *Id.* at 121.

### A. The Impermissibly Suggestive Prong

Before this Court, Appellant contends the photo array and the procedure used to compile the array were impermissibly suggestive for at least four reasons: 1) Appellant's photo in the first array was the only photo with a visible tattoo; 2) Appellant's photo from the first array was the only one to appear in the second photo array; 3) Appellant was the

only individual with a "light complexion" in the second array; and 4) The letter "M" was visible on the tattoo on Appellant's neck in the first photo array, and Appellant was only one of two individuals with tattoos on their necks that contained letters in the second photo array. Appellant also challenges the detectives' failure to show photos of "filler suspects" who more closely resembled him—including the presence of neck tattoos—as required by Maryland Code (2003, 2011 Repl. Vol., 2016 Supp.), Public Safety Article ("PS"), § 3-506.1.[8]

---

[8] In 1999, the United States Department of Justice published certain standards following a National Institute of Justice ("NIJ") study with the goal of "recommending best practices and procedures for the criminal justice community to employ in investigations involving eyewitnesses." U.S. Dept. of Justice, Eyewitness Evidence: A Guide for Law Enforcement (1999), 3 [hereinafter *DOJ Standards*]. The *DOJ Standards* instruct that when creating a photographic lineup, the preparing officer "shall compose the lineup in such a manner that the suspect does not unduly stand out" by, in part, "[c]reat[ing] a consistent appearance between the suspect and fillers with respect to any unique or unusual feature (e.g., scars, tattoos) used to describe the perpetrator by artificially adding or concealing that feature." *Id.* at 29-30. In 2007, pursuant to a newly enacted statute in the Maryland Public Safety Article, Maryland law enforcement agencies were required to adopt policies to comport with the policies set out in the *DOJ Standards*. *See* Maryland Code (2003, 2011 Repl. Vol.), PS § 3-506(a).

Subsequently, in 2014, the statute was amended to include § 3-506.1 outlining specific eyewitness identification procedures over a variety of media. The new statute also required all Maryland law enforcement agencies to either adopt the Police Training Commissioner's Eyewitness Identification Model Policy or "adopt and implement a written policy relating to identification procedures that complies with § 3-506.1" on or before January 1, 2016. PS § 3-506(b).

Currently, Maryland Code (2003, 2011 Repl. Vol., 2016 Supp.), PS § 3-506.1(c) provides, in relevant part:

(c) *Use of fillers* – In an identification procedure:
(1) each filler shall resemble the description of the perpetrator given by the eyewitness in significant physical features, including any unique or unusual features;

18

The State counters that Mr. Lee's description of his assailant's tattoo at the hospital provided the police with an initial reason to select Appellant as a potential suspect. The State maintains that Mr. Lee did not totally exclude Appellant after the first photo array but only equivocated, indicating that the man in the photograph did look like the assailant. This, according to the State, gave the detectives administering the array a tangible reason to place Appellant in the second photo array. Finally, the State asserts that Appellant waived his right to invoke PS § 3-506.1 on appeal.[9]

---

> (2) at least five fillers, in addition to the suspect, shall be included when an array of photographs is displayed to an eyewitness; and
> (3) at least four fillers, in addition to the suspect, shall be included in a live lineup.

[9] The State points out that Appellant failed to invoke PS § 3-506.1 in the proceedings below, and argues that, therefore, Appellant waived his right to invoke the statute on appeal. Additionally, the State argues that even if Appellant did not waive his ability to address the statute in this appeal, the statute does not articulate any remedies for situations in which law enforcement officers fail to comply with the prescribed parameters for the appearance of "fillers."

We note that our decision in this case turns on the precepts enunciated in federal and State decisional law, and not on whether the police followed the proper procedure under PS § 3-506.1. Nevertheless, we exercise our discretion and include analysis of how the statute applies to the facts in this case for purposes of instruction. *Cf. State v. Purvey*, 129 Md. App. 1, 12 (1999) (holding that the exercise of discretion to consider previously unpreserved arguments was not required because the "arguments were presented in summary form during the [] hearing"). In *Morales v. State*, Judge Raker, writing for this Court, reviewed the statutory history of PS § 3-506.1 and underscored that "law enforcement agencies should not take lightly the procedures employed to obtain eyewitness identifications[,]" as "[t]he failure to do so may result in grave consequences. In many instances, a witness' identification of the accused may be the feather that tips the scale in favor of conviction." 219 Md. App. 1, 15-16 (2014). Regardless of whether PS § 3-506.1 articulates available remedies, we are concerned, as we stated in *Morales*, with the importance of law enforcement adhering to the procedures contained in the statute.

Suggestiveness in the context of a photo array arises "when the manner itself of presenting the array to the witness or the makeup of the array indicates which photograph the witness should identify." *Smiley v. State*, 442 Md. 168, 180 (2015) (citations omitted). The inquiry is not whether the police acted improperly, but whether there was police conduct that "tipped off" the witness making the identification "as to which photograph was the photograph of the assailant." *Conyers*, 115 Md. App. at 121. In *Conyers*, Judge Moylan delineated the difference between improper police behavior and impermissibly suggestive police behavior by way of a hypothetical:

> Even if it were to be assumed that the police dragged a witness screaming into the police station, rudely shoved her down in front of a "mug" book containing a thousand photographs, and threatened her that if she did not pick out one of them within the hour they would shoot her on the spot, such behavior would no doubt be improper. It would not, however, be impermissibly suggestive. To do something impermissibly suggestive is not to pressure or to browbeat a witness to make an identification but only to feed the witness clues as to which identification to make. THE SIN IS TO CONTAMINATE THE TEST BY SLIPPING THE ANSWER TO THE TESTEE. All other improprieties are beside the point.

*Id.* (emphasis in original). Thus, as we explained in *Morales v. State,* "[I]t is not a Due Process violation per se that an identification procedure is suggestive." 219 Md. App. 1, 14 (2014) (citation omitted). The identification procedure must not only be suggestive, but *impermissibly* suggestive. *Id.*

When evaluating the procedure employed by law enforcement to obtain a photo identification, trial courts should examine the level of uniformity of physical features between the persons in the photo array. A "similarity in features is critical." *Gatewood,* 158 Md. App. at 477 (citation omitted). However, while the people selected for the photos

20

need to look similar for the photo array to be fair, it "'need not be composed of clones.'" *Smiley*, 442 Md. at 181 (quoting *Bailey v. State*, 303 Md. 650, 663 (1985) (additional citations omitted)). A suspect's unique or unusual feature as described by a witness may be included in the array. *See Sallie v. State*, 24 Md. App. 468, 472 (1975).

To be sure, the inclusion of a unique identifying mark described in detail by a witness may aid in ensuring that an identification is trustworthy. In *Sallie*, this Court considered the implications of including a highly distinguishable feature—a facial scar/mark—in a pretrial photo array identification. *Id.* at 472. In that case, a husband and wife were visiting a neighbor's home across the street one evening and received word from another neighbor that their house was being burglarized. *Id.* at 470. They quickly returned to their home and discovered that the door had been locked from the inside. *Id.* In an attempt to view the assailants, the husband lifted the mail slot and peered in. *Id.* From his vantage point, the husband observed two men in the home and saw a diamond-shaped mark on the right cheek of one of the men. *Id.* The assailants fled the house through the back and disappeared. *Id.* Later that night, the husband described the men to police, including a detailed description of their respective clothing and the diamond-shaped scar on the right cheek of one of the men. *Id.* at 474. Additionally, a young boy who had been in the area at the time told police that he witnessed the two men outside of the home prior to the burglary and knew both men by name. *Id.* at 470-71. One of the police officers who responded to the burglary knew both of the men that the boy had named. *Id.* at 471.

21

The next day, the husband was shown 12 mug shots of African-American men, two of whom were men that police believed matched the description that the husband had provided the night before. *Id.* Despite the general uniformity of the array, the defendant, Sallie, was the only man featured with a diamond-shaped mark on his cheek. *Id.* The husband readily identified Sallie, noting "the mark on Sallie's cheek as part of the reason for identifying him." *Id.* The husband was unable to identify the other assailant. *Id.* Sallie, in an unsuccessful motion to suppress the photo array identification, argued that the inclusion of his diamond-shaped mark made the photo array impermissibly suggestive. *Id.*

On appeal, we held that the inclusion of the mark in the photo array did not render the identification impermissibly suggestive. *Id.* at 472-73. Rather, we reasoned that any perception of suggestiveness was remedied by the reliability of the identification:

> That mark was indeed an identifying characteristic. Observation of identifying characteristics is the core of any identification process. Differences among individuals are the very means by which one may be distinguished from all others. Similarities can lead to confusion, and even to mistake. The not unheard-of-trick of planting a look-alike in the courtroom surely is not employed to aid in the search for truth, but to thwart that search.
>
> [Sallie] argues that his mark is unique. Every individual is unique. The mouth, the lips, the teeth, the chin, the cheeks, the nose, the eyes, the forehead, the ears, the hair, or any combination of two or more of those and other features, make every individual unique. They make him different from all others. They are the basis upon which any person is visually distinguished from other persons. The more subtle the distinctions, the more difficult the identification, and the greater the potential for error. If the burglar in this case had not had such a distinctive mark, then Sallie's mark would have cleared him forthwith as a suspect. The fact that the burglar had the mark, and that Sallie had it, and that the mark is unique, made his identification inevitable indeed, but also made it more rather than less reliable.

*Id.* at 472.

22

More recently, in *Morales*, this Court considered a photographic identification procedure that involved the repetitive use of a person's picture over the course of two photo arrays. 219 Md. App. at 13-19. A father and his two children were robbed at gunpoint. *Id.* at 5. On the night of the robbery, the father and his children "went to the police station and met with [a detective] to make a statement and to look through a photo book that contained pictures of potential suspects." *Id.* The detective placed the children in a room together and placed the father in a separate room.[10] *Id.* at 5. The children identified two individuals in the array—one was the defendant, who had "similar features" to the man who had robbed them. *Id.* at 6. The father was then presented with the photos. *Id.* He failed to make an identification, although he stated that "some pictures looked similar" to the man who robbed him. *Id.* The next day, the investigating officers returned to the victims' home and showed the children a photo array that included a more recent picture of the defendant but did not include a photo of the other man that they had identified in the previous photo array. *Id.* The children reviewed the updated photo array individually, and both identified the defendant as the robber. *Id.* The father was not home at the time, so several days after the incident, the father was shown the same updated photo array as the children. *Id.* The father identified the defendant as the robber and said, "that's him." *Id.*

The defendant moved to suppress the photo array on the ground that the police

---

[10] In *Morales*, the Court noted that placing the children together in the same room and informing them "to look through the photos individually[ and] not to communicate with one another" was a violation of the DOJ's standards for use of a photo array. 219 Md. App. at 5-6, 14-15.

procedure employed in the subsequent photo array was unduly suggestive. *Id.* at 5, 7. The

court denied the motion, stating that

> both children were very clear on the fact that the police didn't tell them which
> picture to pick, they didn't suggest to pick any particular picture, and the
> Court found their testimony as to that, which is really the issue in this case,
> the conduct by the police, credible.

*Id.* at 7. The case proceeded to trial, and the defendant was found guilty. *Id.* at 7, 9.

On appeal, this Court held that the inclusion of the defendant's photo, but not the

other man's photo, in the second photo array was not impermissibly suggestive. *Id.* at 18.

The Court reasoned:

> That the police included [the defendant]'s photo for a second time without
> including the photo of the other potential suspect could be impermissibly
> suggestive *if the record demonstrated that there was some reason for the
> witness to notice it. . . .*
>
> In the instant matter, there is nothing in the record to suggest that the
> witnesses had any reason to notice the repeated use of [the defendant]'s
> photograph. . . . While we agree that it was a factor that [the defendant] was
> the only suspect to appear in both the photo book and the photo array, nothing
> the witnesses said or did indicates that the reason they selected [the
> defendant]'s photograph was *because they had seen it before or because they
> had some reason to notice it.*

*Id.* at 18 (emphasis added) (internal citation omitted).

This Court has held that the prohibitions on impermissibly suggestive procedures in

lineups also apply to photo arrays. *Smith v. State*, 6 Md. App. 59, 69 (1969). In this regard,

*Foster v. California*, 394 U.S. 440 (1969), is instructive because, there, the Supreme Court

considered the due process implications of placing an individual in a police lineup who

was clearly distinguishable from the other people in that lineup. In *Foster*, a witness to a

bank robbery traveled to a police station to view a lineup that included three men, including the defendant. *Id.* at 441. The defendant, who was "close to six feet in height" stood next to two other men who were significantly shorter. *Id.* Additionally, the defendant "wore a leather jacket which [the witness] said was similar to the one he had seen underneath the coveralls worn by the robber." *Id.* The witness "'thought' he was the man, but he was not sure." *Id.* The witness asked to speak with the defendant one-on-one and was permitted to do so. *Id.* Even after this conversation, the witness was still "uncertain whether [the defendant] was one of the robbers[,]" and he testified that "'truthfully—I was not sure[.]'" *Id.* Approximately one week or 10 days later, the witness returned to the police station to view a second lineup. *Id.* The second lineup contained five men, and the defendant "was the only person in the second lineup who had appeared in the first lineup." *Id.* at 441-42. After viewing the second lineup, the witness "was 'convinced' [the defendant] was the man." *Id.* at 442. At trial, the witness described this procedure and made an in-court identification of the defendant. *Id.* The defendant was convicted, and his conviction was affirmed on appeal. *Id.* at 441.

The Supreme Court granted certiorari and reversed. *Id.* The Court observed that the taint of suggestiveness began in the first lineup, when the defendant "stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber." *Id.* at 442-43 (citation omitted). The second lineup failed to ameliorate the already tainted procedure because the defendant was the only person in the first lineup to reappear in the second lineup. *Id.* at 443. In holding that

the identification procedure employed by the police was impermissibly suggestive, the

Court expounded:

> The suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify [the defendant] whether or not he was in fact 'the man.' In effect, the police repeatedly said to the witness, 'This is the man.'
>
> * * *
>
> In the present case the pretrial confrontations clearly were so arranged as to make the resulting identification virtually inevitable.

*Id.* at 443 (citation omitted). As the Supreme Court instructed in *Foster* and this Court restated in *Morales*, the inclusion of an individual—over the course of multiple photo arrays where no other persons are repeated—has the propensity to be suggestive and irreparably taint the identification if the repetition signals to the witness who he or she should select.[11] *See, e.g., People v. Yeoman*, 72 P.3d 1166, 1192 (Cal. 2003) ("To use a suspect's image in successive lineups might be suggestive if the same photograph were reused or if the lineups followed each other quickly enough for the witness to retain a

---

[11] In support of his claim that the police employed an improper procedure, Appellant points to Mr. Lee's testimony that before he viewed the second array, Sgt. Newberg told him "to make sure this was the same person, just to be careful for it." We agree that it is improper for a police officer to verbally imply that the suspected defendant is featured in the photo array. *See* PS § 3-506.1(b)(3); *State v. Nicoletti*, 471 A.2d 613, 615 (R.I. 1984) (stating that when the police suggest to a witness that the perpetrator is in the photo array, the witness is incentivized to select a person featured in the array rather than select a picture that reflects the witness's memory) (citation omitted). In this case, however, Sgt. Newberg's instruction is subject to more than one interpretation. It is just as likely that Sgt. Newberg was instructing Mr. Lee to carefully select the person who most resembled the "same person" that shot him, rather than instructing him that the person in the first photo array that he had already highlighted was also in the second array.

26

distinct memory of the prior lineup."); *State v. Ledbetter*, 441 A.2d 595, 599 (Conn. 1981) ("Pictorial recurrence is suggestive because by emphasizing the defendant it increases the risk of misidentification." (citing *Simmons*, 390 U.S. at 383) (additional citation omitted)); *People v. Jones*, 567 N.Y.S.2d 311, 312-13 (N.Y. App. Div. 1991) ("[P]rocedures involving the repeated display of a single photograph in successive arrays until a positive identification is obtained are viewed with great caution by the courts[.]" (citation omitted)); *People v. Hall*, 438 N.Y.S.2d 148, 148 (N.Y. App. Div. 1981) ("The process of displaying only the defendant's picture twice in a short span of time is fraught with the possibility that the identification resulted from the procedure used and not the witness' recollection[.]" (citation omitted)); *State v. Nicoletti*, 471 A.2d 613, 616 (R.I. 1984) (recognizing that repetition of a photograph across two photo arrays is an important factor to consider in determining whether the procedure is impermissibly suggestive).

Applying the foregoing principles to the present case, we conclude that the identification procedure employed by the police was impermissibly suggestive. The first photo array the police showed Mr. Lee included six potential suspects. Appellant was the sole individual with a neck tattoo, and his tattoo was featured prominently in the photo. This made the first array similar to the lineup in *Foster*, where the defendant "stood out from the other two men by the contrast of his height[.]" *See Foster*, 394 U.S. at 442-43. *Cf. State v. Frazier*, 60 N.E.3d 633, 639 (Ohio Ct. App. 2016) concluding that the photo array used in the identification was not unduly suggestive because "[f]ive of the six men, including [the defendant], had substantial tattoos on their necks; one man, in addition to

27

[the defendant], had a small tattoo on his face."); *Anderson v. State*, 414 S.W.3d 251, 259 (Tex. App. 2013) (holding that the photo array used to identify suspected robber was not impermissibly suggestive as "[a]ll of [the men] appear[ed] to have some tattoos on their neck or upper chest.").

Unlike the unique diamond-shaped scar on the defendant's face in *Sallie, supra*, tattoos are more common, especially in current times. *See, e.g., State v. Rios*, 156 A.3d 18, 44 (Conn. App. Ct. 2017) (stating that "[t]attoos have become ubiquitous in modern society, and acceptance of tattoos by those who do not have one has risen substantially[,]" and taking judicial notice of a recent poll showing that "29 percent of adults in the United States have at least one tattoo, and 69 percent of those individuals have two or more tattoos.")). We recognize that the distinctive features of a particular tattoo—like the unique features of a person's eyes or nose—may be the very characteristic that sets someone apart. But this case illustrates the dangers of highlighting one person in a photo array who has a feature that other people can share (i.e., having a tattoo), without including any other person in the array with a similar feature. Filler photos should include photos of persons who "resemble" the description of the suspect, including "any unique or unusual features."[12]

---

[12] We note that PS § 3-506.1(c) requires that law enforcement agents ensure that each "filler"—a photograph of a person not suspected of committing the crime in question—resembles the description of the suspected perpetrator "in significant physical features, including any unique or unusual features[.]" PS § 3-506.1(c)(1). Here, the officers should have included other persons with tattoos visible on their necks. *Cf. People v. Flores*, 961 N.Y.S.2d 177, 178 (N.Y. App. Div. 2013) ("each [participant in the photo array] had a small tattoo on the right side of his neck that was only partially visible in the

28

When an assailant is described as someone with a tattoo, then the filler photos should include persons with tattoos—not necessarily the same tattoos—in the same general location, if possible, as that described by the witness.

Mr. Lee's identification of Appellant in the first photo array was entirely dependent on the presence of the tattoo in the picture. Mr. Lee testified to the following at the suppression hearing:

> The first time, it was a collection of pictures on the first sheet. I picked out one who kind of looked like him, but I wasn't too sure. I was, like, okay, *I see the tattoo.* I remember there being a LYM tattoo.

(Emphasis added). Yet, Mr. Lee was unable to positively identify his attacker, and estimated that he was roughly "80 percent sure" of his choice. The resultant negative photo array left the police in a quandary. Clearly, if the first array had included other persons with neck tattoos (as in the second photo array in this case), then the police would have been able to repeat at least one of those photos along with Appellant in a subsequent array. What ultimately rendered the identification procedure in this case impermissibly suggestive was, only hours later, including only Appellant from the first photo array—with

___

photographs."). In some states, the police will alter the photographs shown so that each person has a similar tattoo.

While PS § 3-506.1(c)(1) requires photo arrays to include fillers that "resemble" the suspected perpetrator, we do not interpret this to mean that law enforcement officers are required to "touch up" the photos so that every person has virtually the same tattoo. Rather, we hold that when the presence of a tattoo is at the center of the witness's description, law enforcement officers shall include pictures of people with tattoos in generally the same area as the suspected perpetrator to avoid creating a suggestive array. Artificially rendering the identical tattoo on each person in a photo array will more than likely create a dangerous likelihood of an unreliable identification of an innocent person.

29

his distinctive "M" tattooed in cursive on his neck—in the second photo array. When pressed, Det. DiSimone admitted that he did not include tattoos that had letters in his search parameters for the other "fillers."

Even though the investigating officers did not tell Mr. Lee which picture to select, the repetition of Appellant's picture, which featured a virtually identical shot of the tattoo, essentially pointed out to Mr. Lee that the repeated picture was the "correct" choice. *Conyers*, 115 Md. App. at 121. This sequence of events is distinguishable from the identification procedures in *Morales*, where the arrays were shown a day apart and the photographs of the defendant were not only unremarkable, they were also different because the police used an updated photograph in the second array. *See* 219 Md. App. at 6-7. In the instant case, Mr. Lee had several compelling reasons to notice the repetition of Appellant's photo.

The suppression court correctly identified the problematic timing of the photo arrays, along with the fact that Appellant was the only person repeated in the second array, stating:

> My problem is with the timing, with the fact that they showed a picture of the [Appellant] at 8:30 in the morning. In one photo array, he says, "I'm not sure that's the guy," and then they show him another photo array three hours later, approximately three hours later, and the only person that's repeated in the second photo array is the [Appellant]. That's troubling.

We hold that the inclusion of Appellant's photo in the first photo array showing the tattoo on his neck—where no other person had a visible neck tattoo—coupled with the fact that Appellant was the only person whose photo was shown in both arrays, rendered the

30

identification procedure impermissibly suggestive. Accordingly, we turn to the second prong of the due process inquiry: whether Mr. Lee's identification exhibited sufficient indicia of reliability to overcome the suggestiveness of the photo array procedure.

## B. The Reliability Prong

Having determined that the identification was tainted by a high degree of suggestiveness, the test of admissibility becomes "'whether under the "totality of the circumstances" the identification was reliable even though the [procedure] was suggestive.'" *Webster*, 299 Md. 581, 601 (1984) (quoting *Biggers*, 409 U.S. at 199) (additional citations omitted). As noted above, once the accused shows that the identification procedure was impermissibly suggestive, then the burden shifts to the State to show by clear and convincing evidence that under a totality of the circumstances it was reliable. *Smiley*, 442 Md. at 180 (citation omitted); *Gatewood*, 158 Md. App. at 475 (citation omitted). The reliability inquiry is designed to be a limitation on exclusion and is intended to cut against a presumption of inadmissibility for impermissibly suggestive pretrial identifications. *Conyers*, 115 Md. App. at 120.

Appellant argues that the State failed to prove Mr. Lee's identification was reliable by clear and convincing evidence. Appellant highlights several aspects of Mr. Lee's identification that he contends make it unreliable: 1) Mr. Lee encountered the assailant late at night in a location with little lighting; 2) the assailant's face was partially covered by a T-shirt; 3) Mr. Lee reported seeing someone on the street who he believed was the perpetrator, weeks after Appellant was already in custody; and 4) Mr. Lee testified that his

31

confidence in the correctness of his identification waivered throughout the process, dropping to "only 70 percent sure of his identification" shortly before the trial. Appellant also asserts that two momentary interactions at Mr. Lee's workplace do not rise to the "high[] degree of familiarity . . . to overcome an otherwise suggestive array."

To the contrary, the State offers several indicia of reliability, including: 1) Mr. Lee's opportunity to see and speak with Appellant on at least two prior occasions; 2) the physical proximity of Mr. Lee to his assailant during the alleged attempted robbery; 3) the accuracy of the description of Appellant's tattoo; and 4) the fact that the event was still fresh in Mr. Lee's mind when he made the identification. The State places great emphasis on Mr. Lee's testimony that he recognized the person who attacked him from two prior interactions at Staples and recognized his voice. The State contends, therefore, that Mr. Lee did not rely solely on the photograph for making his identification. The State also avers that Mr. Lee's equivocation during his pre-trial identification of Appellant goes to the weight of the evidence, not to its admissibility, and does not justify exclusion of the second array.

The Supreme Court has instructed that "reliability is the linchpin in determining the admissibility of identification testimony[.]" *Brathwaite*, *supra*, 432 U.S. at 114. The Court established a five-factor test that a court should consider in evaluating the reliability of a photo array identification and the likelihood of a misidentification:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the [identification], and [5] the length of time between the crime and the [identification].

32

*Biggers*, 409 U.S. at 199-200.

In *Biggers*, a male assailant wielding a knife grabbed a woman while she was in her home and threw her to the floor. *Id.* at 193. The victim screamed, which attracted the attention of her young daughter, who came into the room and also began screaming. *Id.* at 194. According to the victim, the assailant told her to tell the daughter "'to shut up, or I'll kill you both.'" *Id.* The assailant then led the victim outside and into the woods and raped her. *Id.* After the attack, the victim went to the police station, where she provided a general description of the assailant. *Id.* Over the next several months, the victim viewed several potential suspects in lineups and showups and viewed between 30 and 40 photographs of potential suspects. *Id.* at 194-95. During one of the photo arrays, the victim told police that one of the men in the photographs had similar features to her assailant, but she did not make an identification. *Id.* at 195. Subsequently, the police called the victim and asked her to come to the police station to view a suspect, Biggers, who had been detained on an unrelated charge. *Id.* The police attempted to create a lineup but were unable to find any suitable fillers that fit Biggers' "unusual physical description," at either the city jail or the juvenile detention center, and conducted a showup instead. *Id.* During the showup, officers walked Biggers past the victim several times while prompting him to say "'shut up or I'll kill you.'" *Id.* The victim identified Biggers as the assailant. *Id.* At trial, Biggers was convicted of rape, based in part on testimony regarding the victim's identification at the police station during the showup. *Id.* at 189.

The Supreme Court considered Biggers' habeas corpus petition, which asserted that the identification procedure violated due process. *Id.* at 190. Setting out and applying its five-factor test, the Court determined that, despite the use of the unnecessarily suggestive identification procedure, due process requirements did not demand suppression of the victim's identification. *Id.* at 199-200. The Court weighed the facts of the case, and determined that the victim was able to view her attacker in great detail, as she

> spent a considerable period of time with her assailant, up to half an hour[, and] was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately.

*Id.* at 200. As to her degree of attention, the Court noted that "[s]he was no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Id.* (footnote omitted). The Court remarked that the victim's description of her assailant was accurate, as it included "the assailant's approximate age, height, weight, complexion, skin texture, build, and voice[.]" *Id.* In regard to the victim's level of certainty, the Court noted that "[s]he had 'no doubt' that [Biggers] was the person who raped her. . . . She testified at the habeas corpus hearing that there was something about his face 'I don't think I could ever forget.'" *Id.* at 200-01. Finally, in considering the length of time between the rape and the identification—seven months—the Court instructed:

> This would be a seriously negative factor in most cases. Here, however, the testimony is undisputed that the victim made no previous identification at any of the showups, lineups, or photographic showings. Her record for reliability was thus a good one, as she had previously resisted whatever suggestiveness inheres in a showup.

*Id.* at 201.

In *Brathwaite*, the Supreme Court clarified that the *Biggers* factors are not intended to be exclusive because the reliability of an identification should be determined by the totality of the circumstances and by weighing the facts of each case. 432 U.S. at 116. *See also Wood v. State*, 196 Md. App. 146, 162 (2010) (interpreting *Brathwaite* and noting that "[a] reliability appraisal[ ] is extremely fact-specific. It is a multi-factored determination that, with help of guidelines, looks to the totality of the circumstances."). For example, in addition to the presence of a unique identifying mark, such as the scar in *Sallie,* several courts have emphasized the level of prior familiarity between the witness and the accused as "relevant to whether a 'suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.'" *Haliym v. Mitchell*, 492 F.3d 680, 706 (6th Cir. 2007) (quoting *Brathwaite*, 432 U.S. at 107). *See also U.S. v. Lawrence*, 349 F.3d 109, 116 (3d Cir. 2003) (noting that in the totality of the circumstances, the most important consideration in the reliability of the identification was that "both of th[e] witnesses knew [the defendant] and had seen him on multiple occasions before the shooting."); *State v. Glass*, 620 S.E.2d 371, 373-74 (Ga. 2005) (holding that identification of defendant who killed the witness's neighbor in a drive-by shooting was reliable because the witness knew the shooter by sight and identified the shooter by his alias).

To resolve whether the identification in this case was sufficiently reliable to overcome the highly suggestive nature of the photo array, we examine next the factors set out in *Biggers*, 409 U.S. at 199-200, as well as Mr. Lee's prior familiarity with Appellant and his initial description of Appellant's unique tattoo.

## 1. Applying the *Biggers* Factors

### *1. Opportunity to view*

Mr. Lee observed his attacker on a "pitch black[]" street "after midnight[,]" but there was "light [] on him, so it was kind of easier to see him because of where he was standing." At the time of the crime, Mr. Lee was "maybe a foot[]" away from his assailant and estimated that he was able to view his assailant for approximately two minutes. During this period, although his assailant had his shirt pulled up over the lower front of his face, Mr. Lee was able to see a portion of his attacker's face, beard, hair, and most importantly, the tattoo on the side of his neck. These facts weigh in favor of reliability.

### *2. Degree of attention*

During the testimony elicited at the suppression hearing, Mr. Lee noted that when his attacker approached and demanded money, he "saw the gun first before [he] saw the guy connected." Mr. Lee stood up and emptied his pockets to show the assailant that he did not have his wallet. The presence of the weapon may have affected Mr. Lee's ability to concentrate on the appearance of the tattoo, but this determination is ultimately for the fact finder to weigh accordingly. *See Smiley*, 216 Md. App. at 37-38 (holding that whether the display of a weapon during the commission of a crime reduces the reliability of an eyewitness-victim's extrajudicial identification is "'intuitive'" and can be dealt with accordingly during cross-examination of the witness). These facts support reliability.

### *3. Accuracy of the description*

Within hours of the attack, when Mr. Lee was at the hospital, he described his

36

attacker as "[a] black male, light skin[] . . . a light [T]-shirt, tattoo on the right side of his neck, 5'8", regular sized, a short haircut." Mr. Lee noted that his attacker "held the bottom of his shirt up over his face[,]" was wearing blue jeans, and that the "block letter tattoo" had the "letter M in it." Although Mr. Lee "made it very clear there was a shirt that was covering the face[,]" he described, in detail, a portion of the neck tattoo, which allowed him to make an identification. He told Det. DiSimone that he recognized his assailant because of "the tattoo and his voice." These facts weigh in favor of reliability.

*4. Level of certainty*

Mr. Lee's level of certainty constantly varied throughout the course of the investigation and up to the date of trial. During the first photo array, Mr. Lee identified Appellant as the man who could have shot him, but told the detective conducting the array that the assailant was concealing part of his face with his shirt. The State conceded that the first array, which Det. DiSimone categorized as "negative," should have included a tattoo in each picture. Despite Appellant being the only individual to appear with a tattoo, Mr. Lee indicated that he was only "80 percent sure." Subsequently, Mr. Lee gave another taped statement where he described the tattoo that he had just viewed. After the second photo array, Mr. Lee was "100 percent" sure that Appellant was the person who shot him because of "[t]he tattoo specifically."

Roughly two weeks after completing the second photo array, Mr. Lee doubted his identification when, while walking down a street in Baltimore, he encountered a different man who he believed may have been the assailant. At the suppression hearing Mr. Lee

37

indicated that he remained only 70 percent sure of his identification, but could not articulate why he was less sure. Overall, we conclude these facts weigh somewhat against reliability.

*5. Length of time before identification*

Mr. Lee was able to describe his assailant to police while the memory was "fresh" in his mind. The alleged robbery occurred at roughly 2 a.m., and Mr. Lee identified Appellant in the second photo array less than ten hours later. These facts also weigh in favor of reliability.

## 2. Mr. Lee's Prior Familiarity with Appellant

Mr. Lee testified that he had seen a man with the same tattoo as Appellant's at his workplace on two different occasions. Specifically, Mr. Lee recalled that he was "100 percent [sure] that that was the person" after the second array because when he saw Appellant's tattoo, "[i]t was almost like a rush of memory from both Staples [sic] and what I remembered seeing that night." Additionally, Mr. Lee also mentioned that he was familiar with the assailant's voice because he had heard it before at Staples.

The suppression court, in its decision not to suppress the second photo array, found that the second array was

> reliable by clear and convincing evidence because[] the victim – the alleged victim knew who the Defendant was. He had already seen him twice before. He recognized his voice. It had nothing to do with the photograph.

Appellant insists that Mr. Lee's prior interactions with him failed to establish an "acquaintanceship" between the two that could bolster the reliability of an already suggestive identification procedure. Appellant relies on *State v. Clopten*, 223 P.3d 1103,

1116-17 (Utah 2009), which holds that a single sighting of a person from a distance by two different witnesses prior to an extrajudicial identification—absent any other independent corroboration of the reliability of the identification—made both witnesses "essentially strangers to [the defendant]." Appellant avers that the "legal standard for what constitutes an 'acquaintance' requires a high degree of familiarity," such as that between the victim and the defendant in *Green v. United States*, 580 A.2d 1325 (D.C. 1990). There, the court held that a shooting victim's description of the defendant was sufficiently reliable to overcome an impermissibly suggestive single-photo lineup because the defendant and the victim had lived together for approximately six months prior to the shooting, and the victim had told police before seeing the photo that the defendant was the shooter. *Id.* at 1326-27.

We do not adopt the view that consideration of prior familiarity is limited to the high degree of "acquaintanceship" that Appellant advocates. The degree of prior familiarity between the witness or victim and the perpetrator is but one factor in the totality of circumstances involved in an identification. Although a lesser showing of prior familiarity may require stronger independent indicia of reliability, we will not deem irrelevant a victim's prior contact with his or her assailant simply because they met only a few times before, as in the instant case. The reliability of Mr. Lee's identification here hinges not only on his prior interactions with Appellant, but also his opportunity to observe his attacker on the night in question and his ability to identify the tattoo in such detail. Therefore, while we recognize that Mr. Lee's prior familiarity with Appellant, standing alone, may not be sufficient to overcome the suggestive procedure in this case, it

39

nonetheless bolsters the reliability of the identification when considered in the totality of the circumstances.

### 3. The Presence of Appellant's Unique Neck Tattoo

Finally, as we held in *Sallie, supra*, 24 Md. App. at 472, the presence of a distinctive mark in a photo array—there, a diamond shaped facial scar—may bolster the reliability of the identification. Mr. Lee recalled the specifics of his assailant's tattoo at the hospital in his first interview. Then, as Det. DiSimone testified, after Mr. Lee returned to the police station, but before he viewed the first photo array, he described the tattoo as "[b]lock styled cursive script, bold, not dull, containing multiple letters and at least one of them was an M[.]" It is clear from Mr. Lee's statements and testimony not just that he saw a tattoo on his assailant's neck, but that the tattoo was distinctive and able to serve as an identifying feature during the investigation. The fact that both Mr. Lee's assailant and Appellant had the unique cursive block letter tattoo with an "M" made Mr. Lee's identification "inevitable indeed, but also made it more rather than less reliable." *Id.* Accordingly, as this Court did in *Sallie*, we conclude that Mr. Lee's detailed familiarity with Appellant's tattoo prior to the photo array made Mr. Lee's identification of Appellant more reliable.

In sum, after reviewing the totality of the circumstances presented in the record under the *Biggers* factors, and noting Mr. Lee's prior familiarity with Appellant, as well as the detailed description he provided of Appellant's unique tattoo prior to the photo array, we hold that Mr. Lee's identification of Appellant was sufficiently reliable to overcome

the suggestive nature of the identification procedure.  Accordingly, we affirm the suppression court's decision to deny the motion to suppress the second photographic array.

## II.

### The State's Closing Argument

Appellant challenges the following remarks by the prosecution delivered during rebuttal closing argument:

> And as [defense counsel] pointed out how do [witnesses] testify?  How did Ms. Thomas[, Appellant's girlfriend,] testify?  Did she testify like someone that was speaking truthfully and honestly?  No.  You saw her.  Now did you talk to [Appellant] about the case?  Well, yeah, no, not really.  We didn't discuss it.  This is your boyfriend.  This is the father of your child.  You know your testimony's important but you never talked about it?  Is that really likely?  No.

Appellant maintains that the closing comments were impermissible as they amounted to improper vouching and were based on pure opinion without support in the record, which misled the jury and unfairly prejudiced Appellant.  Appellant claims that the State's impermissible comments concerning Ms. Thomas's credibility shifted the burden of proof improperly to Appellant to prove that Ms. Thomas was telling the truth.

The State counters that the prosecutor's remarks during closing arguments were not improper and that addressing a witness's credibility during closing arguments based on evidence established during the trial does not amount to improper vouching.

### A. Relevant Facts

On cross-examination of Ms. Thomas, Appellant's girlfriend at the time of the trial, the State began a line of questioning to demonstrate her potential bias and motive to lie:

41

[THE STATE]:  Ms. Thomas, you are the girlfriend of [Appellant]?

[MS. THOMAS]:  Yes.

[THE STATE]:  And you're still together, correct?

[MS. THOMAS]:  Yes.

[THE STATE]:  And you have a child together?

[MS. THOMAS]:  Yes.

[THE STATE]:  And is it fair to say you want him to come home?

[MS. THOMAS]:  Right.

[THE STATE]:  And he lives with you?

[MS. THOMAS]:  He goes back and forth from my house to his grandmother['s] house.

[THE STATE]:  Okay.  And does he work?

[MS. THOMAS]:  No.

[THE STATE]:  So you take care of the house?

[MS. THOMAS]:  Yes.

[THE STATE]:  All right.  And have you talked to [Appellant] about this case and what you would testify to?

[MS. THOMAS]:  No.

[THE STATE]:  You've never had any conversation with [Appellant]?

[MS. THOMAS]:  We have before, yes.

[THE STATE]:  So you talk every day, correct?  This is your boyfriend?

[MS. THOMAS]:  Yes.

[THE STATE]: The father of your child?

[MS. THOMAS]: Yes.

[THE STATE]: And you never talked about what you would testify [ ] to today?

[MS. THOMAS]: It had already been established like –

[THE STATE]: You had already agreed what you would say?

[DEFENSE COUNSEL]: Objection.

[MS. THOMAS]: We –

[THE COURT]: Overruled. You may answer the question.

[MS. THOMAS]: We didn't agree to it, like –

[THE STATE]: But you told him what you would say?

[THE COURT]: Okay, let her finish her answer.

[THE STATE]: Yes, Your Honor.

[THE COURT]: Go ahead.

[MS. THOMAS]: So we didn't agree to like –

[THE COURT]: But her question is have you ever talked to him about what you were going to say.

[MS. THOMAS]: Yes.

[THE STATE]: And you believe that you mean to testify in order to help him, right?

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Overruled.

[MS. THOMAS]: Yes.

43

[THE STATE]:  And that's what you're doing here today, trying to help him?

[MS. THOMAS]:  I'm actually telling the truth, yeah, to help him come home.

[THE STATE]:  And you spent the whole night together on June 16th up until the next day, right?  That's what you told [defense counsel] when he asked you.

[MS. THOMAS]:  [Y]es.

[THE STATE]:  Right.  And when you came to the police station you talked to the police right?

[MS. THOMAS]:  Yes.

[THE STATE]:  And the police asked you exactly where you had spent the night and you wouldn't tell them where you live, right?

[DEFENSE COUNSEL]:  Objection.

[THE COURT]:  Overruled.

[MS. THOMAS]:  Yes.

[THE STATE]:  So you're saying he's with you, but you won't tell the people who's investigating that could help clear his name exactly where he was; they were just supposed to believe you, right?

[MS. THOMAS]:  I told them he was with me.  I didn't give them my correct address, yes.

[THE STATE]:  But they asked you your address, correct?

[MS. THOMAS]:  Yes.

[THE STATE]:  And you wouldn't give it?

[MS. THOMAS]:  No.

44

During the State's rebuttal closing argument, the prosecutor addressed Ms. Thomas's credibility as a witness and highlighted the fact that she refused to give her address to police officers:

> [THE STATE]: [Defense counsel] says, well, why didn't [the arresting officer] get a search warrant? Where's he [ ] supposed to get a search warrant to? Is it the address that Ms. Thomas wouldn't give? She's the alibi witness. She's the person that [defense counsel] wants you to believe that the witness was home and said that they're laying [sic] in bed all night long.
>
> And it's so important, it's so important of where he is to show that he wasn't the person that committed this crime that you don't even bother to say where? That's the most important part of it. We don't care where she worked, what time she got off, when she went home, if she made a phone call at 11:30 or she made a phone call at 12:30. We want to know where [Appellant] is because [Appellant] is the one that's being accused.
>
> And she says I want to help him. Is it important that he come home? Yes. Have you talked about this case? Yes. And you didn't think telling the police where you live is an important fact? It's important if that's where [Appellant] is supposed to have been at. Why wouldn't you tell them that?
>
> **And as [defense counsel] pointed out how do [witnesses] testify? How did Ms. Thomas testify? Did she testify like someone that was speaking truthfully and honestly? No. You saw her. Now did you talk to [Appellant] about the case? Well, yeah, no, not really. We didn't discuss it. This is your boyfriend. This is the father of your child. You know your testimony's important but you never talked about it? Is that really likely? No.**

(Emphasis added).

Without objection, the prosecutor continued the closing argument, moving from the issue of Ms. Thomas' bias to Mr. Lee's statements at the hospital and at the police station:

> [THE STATE]: You hear [defense counsel] go over what Mr. Lee testified to[.] He says they go on tape at 9:39 [a.m.] and that's the first statement he gives. We know that's not true. Mr. Lee said he gave the first statement to the initial officer. And he tells them light-skinned male, what he's wearing,

white T-shirt, blue jeans, tattoo on his neck; he tells them the area. That's the first statement he gives.

And then when he goes to the police station he's shown a photo array. And you've got the – you've heard the stipulation that he's shown the photo array from 8:30 in the morning and he looks at a picture. He looks at a picture of [Appellant] and says looks like him; doesn't think it's him.

**And when I asked him why did you not say then that was the person, and his response was –**

[DEFENSE COUNSEL]: **Objection.**

[THE COURT]: Overruled.

(Emphasis added).

## B. Preservation of the Issue

Before considering whether to address the merits of Appellant's claim that the State's comments during summation were improper and prejudiced Appellant to the degree that Appellant should be granted a new trial, we address the State's contention that the claim was not preserved. The State maintains we should not consider Appellant's argument because defense counsel did not object and properly preserve the issue at the time that the remarks were made. The State also contends that the matter is not susceptible to plain error review. We agree.

Pursuant to Maryland Rule 8-131(a), this Court ordinarily "will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]" *See Univ. Sys. of Md. v. Mooney*, 407 Md. 390, 401 (2009) ("The purpose of [Md. Rule 8-131(a)] is 'to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any

46

errors in the proceedings[.]'" (citations omitted)). In order to preserve an objection to an allegedly improper closing argument, defense counsel must object either immediately after the argument was made or immediately after the prosecutor's initial closing argument is completed. *Jones-Harris v. State*, 179 Md. App. 72, 101-02 (2008). While "there is no bright-line rule to determine when an objection should be made[,] . . . the objection must come quickly enough to allow the trial court to prevent mistakes or cure them in real time[.]" *Prince v. State*, 216 Md. App. 178, 194 (2014) (additional citation omitted).

In the current case, the objection came neither immediately after the allegedly improper argument, nor immediately after the closing argument was complete. The only objection followed a subsequent set of remarks on a different topic and was clearly intended to forestall the admission of hearsay evidence. Accordingly, we hold that this issue is unpreserved and not properly before us to consider on appeal.

## C. The Propriety of the State's Closing Argument

Even if the issue was preserved, we are not persuaded that the comments were in error. Generally, attorneys are afforded "great leeway in closing arguments." *Ware v. State*, 360 Md. 650, 681 (2000) (citation omitted). The freedom to make arguments to the jury during closing "is not unlimited and does not include the right to discuss facts not in evidence." *Id*. at 682 (citations omitted). Not every improper prosecutorial remark, however, necessitates reversal. *Reidy v. State*, 8 Md. App. 169, 172 (1969). In order to justify reversal, it must appear that the jury was "misled or [was] likely to have been misled or influenced to the prejudice of the accused by the remarks of the State's Attorney[.]" *Id.*

(citation omitted). The determination of whether allegedly improper prosecutorial comments were "prejudicial or simply rhetorical flourish" is left to the sound discretion of the trial court. *Degren v. State*, 352 Md. 400, 431 (1999) (citations omitted). The decision of the trial court will not be disturbed unless there was a clear abuse of discretion that prejudiced the accused. *Id.* (citation omitted).

While there is no bright-line rule concerning where an attorney is permitted to tread during closing arguments, Maryland has held consistently that an attorney "may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses." *Id*. at 430 (citations omitted). When undermining the credibility of a defense witness, however, the State may use only evidence established in the record, *id.* at 433, and may not shift the burden of proof to the defendant to prove that the witness is lying. *Lawson v. State*, 389 Md. 570, 596 (2005). In addition, Maryland prohibits improper "vouching" by the State for the truthfulness of a witness. *Sivells v. State*, 196 Md. App. 254, 277 (2010). Vouching happens when the prosecutor puts "the prestige of the government behind a witness through personal assurances of the witness's veracity . . . or suggests that information not presented to the jury supports the witness's testimony." *Id.* (quoting *Spain v. State*, 386 Md. 145, 153 (2005) (internal quotations omitted)). Maryland has squarely held that although vouching for a witness's credibility is improper, "[t]he rule against vouching does not preclude a prosecutor from addressing the credibility of witnesses in closing argument." *Id*. at 278.

48

Here, the prosecutor was well within her rights to challenge Ms. Thomas' credibility by highlighting her potential bias and motive to lie. The State properly based its comments in question on testimony developed during trial where it was established that: 1) Appellant and Ms. Thomas have a child together; 2) Appellant and Ms. Thomas are currently dating; 3) Ms. Thomas wants Appellant to come home; and 4) Appellant and Ms. Thomas reviewed what she would say in her trial testimony. During the State's rebuttal closing, the State reiterated each of these points, asking the jury to draw reasonable inferences associated with Ms. Thomas' possible motive to lie, something which the jury had already been tasked with and properly instructed. At no point did the prosecutor place the prestige of the government behind Mr. Lee as a witness for the State, nor did the prosecutor provide any personal assurances that he was telling the truth. Moreover, as the State points out, the trial court had already instructed the jury that exercising common sense was appropriate for purposes of evaluating the evidence and determining witness credibility.[13] Therefore,

---

[13] The trial court instructed the jury instruction in relevant part:

You may draw any reasonable inferences or conclusions from the evidence that you believe to be justified by common sense and your own experiences.

* * *

[Y]ou are the sole judges of whether a witness should be believed. In making this decision you may apply your own common sense and everyday experiences.

* * *

You should consider such factors as the witness's behavior on the stand and manner of testimony. Did the witness appear to be telling the truth? . . . [D]oes the witness have a motive not to tell the truth? Does the witness have an interest in the outcome of the case?

49

we hold that, even if Appellant preserved this argument for appeal, the State's closing argument was not improper.

## III.

### The Exclusion of the Phone Records

Defense counsel sought to establish that Appellant spoke to Ms. Thomas on the phone on the night in question around 10:30 p.m. and that she spoke to him again on the phone the next morning around 8:00 a.m. Appellant contends that the court's exclusion of phone records showing that those calls were made was an abuse of discretion. Appellant proffers that the admission of the records would have altered the course of the trial if the jury was permitted to view the records, and the failure to admit the records corroborating Ms. Thomas' testimony effectively denied Appellant the right to a fair trial.

The State asserts that the records were cumulative evidence, and defense counsel failed to establish why any of the phone calls would be relevant.

### A. Relevant Facts

On direct examination, Ms. Thomas testified:

[MS. THOMAS]: I worked that evening at 5:00. I got off around 10:30 or so and I dropped my friend off first on Cold Spring Lane and then I kept calling [Appellant]. He was already at the house waiting for me. So [I] c[a]me home and then I went home with [Appellant].

[DEFENSE COUNSEL]: Let me stop you there. Did you call [Appellant]?

[MS. THOMAS]: Yes.

[DEFENSE COUNSEL]: And after you called him what did you do?

50

[MS. THOMAS]: Dropped my friend off. Meet (indiscernible) our house because (indiscernible) cooked, and then when I got to the house I called him to let him know I was outside.

Ms. Thomas testified further that the two went to sleep together and awoke around 8:00 the next morning. Her testimony continued:

[DEFENSE COUNSEL]: And when you got up the next morning do you recall what you and [Appellant] did?

[MS. THOMAS]: He left out, and then I called his phone a little bit right after he left out to let him know he forgot [something].

Defense counsel then asked to approach, where the following ensued:

[DEFENSE COUNSEL]: Your Honor, I have certified phone records of [Appellant]. I've provided them to the State already.

THE COURT: No, did you provide her with a certificate that they were authenticated?

[DEFENSE COUNSEL]: Yes. Yes.

[THE STATE]: He did, Your Honor.

[THE COURT]: Are you objecting?

[THE STATE]: The State would object.

[THE COURT]: (Indiscernible).

[THE STATE]: He provided the information. The State would object.

[THE COURT]: What's the basis of your objection?

[THE STATE]: She testified that they made the phone call and that she called him. (Indiscernible) these records to say that she's already testified to.

[THE COURT]: I'll sustain it. Objection's sustained. . . . Any other questions, [defense counsel]?

51

[DEFENSE COUNSEL]: Court's indulgence. No, no further questions.

After the trial judge read the jury instructions, the court summoned counsel to the bench to discuss exceptions to the court's instructions. It was at the conclusion of exceptions to the instructions that defense counsel noted an objection to the court's prior ruling on the phone records:

> [DEFENSE COUNSEL]: And before we go any further, Judge, I'm going to just note my objection to the Court not allowing the (indiscernible) phone records.
>
> [THE COURT]: Oh, you're way past that.
>
> [DEFENSE COUNSEL]: Okay.
>
> [THE COURT]: You should have made that (indiscernible), okay. You can't fix it now.

## B. Preservation of the Issue

The State asserts that the exclusion of the records was not properly preserved as defense counsel failed to object to the exclusion of the records or make an offer of proof at the time the admission of the records was being considered. Appellant maintains that there was no need for an objection following the exclusion of the phone records, as defense counsel made an offer of proof as to the phone calls that "was absolutely clear . . . that the telephone records the Defense sought to admit immediately following Ms. Thomas's testimony would have corroborated her testimony."

Appellant's counsel's failure to make a proffer at trial when the court sustained the State's objection controls this issue on appeal—both because it precludes our review and

because it illustrates why the trial court's ruling was not an abuse of discretion. We explain.

As Judge Moylan wrote in *Muhammad v. State*, we entrust "broad discretion . . . to the trial judge to control the flow of the trial and the reception of evidence." 177 Md. App. 188, 273-74 (2007) (citing Md. Rules 5-104(a) & 5-403 (additional citations omitted). Quoting from the Court of Appeals decision in *Smith v. State*, 371 Md. 496, 504 (2002), Judge Moylan continued:

> [T]he right to present a defense, albeit fundamental, is nonetheless subject "to two paramount rules of evidence, embodied in both case law and in Maryland Rules 5–402 and 5–403. The first is that *evidence that is not relevant to a material issue is inadmissible.* The second is that, *even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of* unfair prejudice, *confusion of the issues, or misleading the jury.*"

*Id.* at 274 (emphasis in *Muhammad*) (additional citation omitted).

When challenged on appeal, we review the trial judge's decision to exclude evidence for abuse of discretion. *Id.* "The abuse of discretion standard requires a trial judge to use his or her discretion soundly and the record must reflect the exercise of that discretion. Abuse occurs when a trial judge exercises discretion in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law." *Campbell v. State*, 373 Md. 637, 665-66 (2003) (citation omitted).

Importantly, "[a] claim that the exclusion of evidence constitutes reversible error is generally not preserved for appellate review absent a formal proffer of the contents and materiality of the excluded testimony." *Muhammad*, 177 Md. App. at 281 (citing Md. Rule

5-103(a)(2) (additional citations omitted). The Court of Appeals's decision in *Bruce v. State*, 328 Md. 594 (1992), is instructive on this point.

In *Bruce*, the State's attorney objected to a line of questioning by the defense attorney concerning whether a witness had a prior conviction for carrying a gun. *Id.* at 624. At a bench conference, defense counsel suggested that the witness had testified previously that she was convicted of carrying a gun so the question was "solely to test her credibility." 328 Md. at 625. When the court stated that it did not believe carrying a weapon is "a proper conviction for cross-examination," defense counsel argued that "it goes to the fact that [the gun conviction] was in the same transaction with regard to the drugs." *Id.* At that point, the court sought clarification: "You're using it as a conviction to impeach her credibility, right?" *Id.* Defense counsel pivoted, "No. I'm showing that she was part of [the victim's] organization, that she was carrying one—she was carrying a gun and she was a member of [the victim's] organization." *Id.* The court ruled that the question, in the form asked, was improper, and defense counsel moved on from that line of questioning. *Id.* On appeal, the Court of Appeals reasoned that "[t]he precise purpose for which [defense] counsel sought to elicit information about the handgun conviction never emerged at the proceeding[;]" defense counsel had first suggested it was to impeach the witness and then to show she was part of the victim's criminal organization "*without ever making clear to the court the ultimate aim of such a showing.*" *Id.* at 625-26 (emphasis added). This failure precluded review, because "[a] party must clearly proffer his [or her] theory to the trial court in order to challenge on appeal the sustaining of objections to those questions." *Id.* at 626 (citation

54

omitted). Further, even if Bruce had preserved the issue with a proper proffer, the Court ruled that "[t]he handgun violation shed no additional light on the issues, and we cannot say that excluding the testimony was an abuse of discretion." *Id.*

Under the weight of this precedent, Appellant's claim fails for the same reason here. When the trial court sustained the State's objection that the phone records were cumulative to Ms. Thomas' testimony, Appellant's counsel made no attempt to argue at trial why the phone records were of such paramount importance. Through the benefit of hindsight and our review of the complete trial record, it may be evident *now* that defense counsel anticipated the State's subsequent attempts on cross-examination to discredit Ms. Thomas as a witness and sought to use the records to bolster her credibility. But defense counsel made no such representation to the trial court; instead, defense counsel accepted the trial court's ruling and moved on. Consequently, any argument that the records were more than merely cumulative is not preserved for our review.[14]

---

[14] Even if the issue had been preserved, we are not convinced that the trial court's decision to exclude the phone records was in error. As we explained above, the trial court has broad discretion to control the flow of evidence, and, at the point when the State objected, the trial court exercised its discretion to adjudge the records to be cumulative. The importance Appellant placed on those records was not readily apparent at the time because defense counsel failed to explain it at the time of the State's objection. Accordingly, we cannot find the trial court's ruling to be an abuse of discretion now. Had this occurred as part of the defense's re-direct of Ms. Thomas, perhaps Appellant's argument would carry more weight.

## IV.

## The Sufficiency of the Evidence

Appellant argues that the State did not present evidence of sufficient caliber or quantity to convict him, alleging that the trial court erred in failing to grant his motion for judgment of acquittal. Appellant bases his challenge primarily on the contention that Mr. Lee was a "shaky" eyewitness, whose testimony, in the absence of forensic evidence, was not sufficient to prove beyond a reasonable doubt that Appellant was the assailant. The State contends the evidence submitted at trial was sufficient to convict Appellant, and posits any inconsistencies in Appellant's identification and subsequent testimony go to the weight of the evidence considered, not its sufficiency. We agree with the State, and find that Mr. Lee's testimony was sufficient to convict Appellant.

We review the evidentiary sufficiency of a criminal conviction not to determine whether we believe Appellant was guilty beyond a reasonable doubt, *State v. Rusk*, 289 Md. 230, 240 (1981), but "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in *Jackson*)). We extend great deference to the fact finder's "finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *McDonald v. State*, 347 Md. 452, 474 (1997). Our review concerning whether the evidence presented was sufficient to convict "does not involve a re-weighing of the evidence[.]" *Moye v. State*, 369 Md. 2, 12 (2002). Rather,

our task is to determine whether the jury's verdict was supported by "evidence by which any rational trier of fact could find [Appellant] guilty beyond a reasonable doubt" of the crimes charged. *Id.* at 12-13 (citations omitted). Moreover, because of the jury's "unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Smith v. State*, 415 Md. 174, 185 (2010).

In *Branch v. State*, 305 Md. 177 (1986), the Court of Appeals had the opportunity to define the outer perimeters of the theory that a single eyewitness is sufficient to permit a rational jury to find guilt beyond reasonable doubt. In that case, the victim, shortly after being robbed by two men at gunpoint, described the assailant holding the gun to police as a "black male, approximately 5 feet 7 inches tall, 15 to 16 years of age, weighing 110-125 pounds[.]" *Id*. at 178. Later that morning, the victim was shown two mugshot books containing approximately 600 photos, but was unable to identify her assailant. *Id*. The investigating officer then showed the victim an additional three photographs, one of which the victim identified as her attacker. *Id.* The photo that the victim chose was of Larry Branch, a 6 foot 3 inch, 19 year old man who weighed 185 pounds. *Id*. at 179. At trial, the victim identified Branch and, despite several attacks concerning the differences between her initial description and the actual physical characteristics of the defendant, and the testimony of several alibi witnesses, the jury convicted Branch. On certiorari review, the Court of Appeals affirmed, recognizing the "substantial discrepancy between the

57

description given by the victim of the crime almost immediately after the incident and the actual description of the accused." *Id.* at 184. The Court instructed that the inconsistencies in the identification go "to the weight and not to the sufficiency of the evidence." *Id.* at 184. Moreover, the Court stated, "[t]he issue of credibility[ ] is one for the trier of fact." *Id.*

Returning to the current case, given Mr. Lee's initial description of his assailant's physical features and neck tattoo, his prior familiarity with Appellant, and his in-court identification of Appellant, there was sufficient evidence to send the issue of guilt to the jury. The determinations of whether to believe Mr. Lee, as well as the weighing of his credibility as a witness, were squarely within the purview of the jury. Accordingly, we affirm the trial court's denial of Appellant's motion for judgment of acquittal and hold that there was sufficient evidence for a reasonable jury to conclude that Appellant was the culprit.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**